GRIFFON IMPORTING CO. *v.* UNITED STATES (No. 4603)[1]

[1] C. A. D. 408.

122

United States Court of Customs and Patent Appeals, March 22, 1949

*Brooks & Brooks* (*Oscar E. Bland, H. Kennedy McCook*, and *Frederick W. Brooks* of counsel) for appellant.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

*McKenna & Osborn, amicus curiae.*

[Oral argument December 9, 1948, by Mr. Bland, Mr. Donohue, and Mr. McKenna]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, C. D. 1106, which overruled appellant's protests and held that certain importations of glass bottles from England were properly classified and assessed with duty at 75 per centum ad valorem under paragraph 218 (e) of the Tariff Act of 1930. Appellant, the importer, claimed in its protest that the merchandise was properly dutiable under the same paragraph at 25 per centum ad valorem.

Paragraph 218 (e) reads as follows:

PAR. 218. * * * (e) Bottles and jars, wholly or in chief value of glass, of the character used or designed to be used as containers of perfume, talcum powder, toilet water, or other toilet preparations; bottles, vials, and jars, wholly or in chief value of glass, fitted with or designed for use with ground-glass stoppers, when suitable for use and of the character ordinarily employed for the holding or transportation of merchandise; all the foregoing produced by automatic machine, 25 per centum ad valorem; otherwise produced, 75 per centum ad valorem. For the purposes of this subparagraph no regard shall be had to the method of manufacture of the stoppers or covers.

The question presented is whether, within the purview of the statute, the imported bottles were "produced by automatic machine" or were "otherwise produced." The same question was before the Customs Court in the case of *Jos. Riedel Glass Works, Inc.* v. *United States*, 12 Cust. Ct. 173, C. D. 849, and the judgment rendered therein was affirmed by this court in *United States* v. *Jos. Riedel Glass Works, Inc.*, 32 C. C. P. A. (Customs) 201, C. A. D. 307.

Appellant offered in evidence at the trial the deposition of one John Arthur Maier, and there is no dispute here that, as described in the deposition, the involved bottles were produced by a machine in the following manner:

a. Molten glass is transferred, by a gatherer using a solid gathering iron, from the furnace to the parison mould to which are fitted the neckring moulds.

b. No. 1 Operator cuts off sufficient glass which, by means of vacuum created by continuously working pumps to which the machine is connected, is automatically sucked into the neck moulds. This operation forms the aperture, the brim and the external shape of the neck of the bottle.

c. The quantity of glass is largely determined by the size or capacity of the parison mould and also partly by the point at which the operator cuts the glass from the gathering iron.

d. *Compressed air, supplied from power driven compressors, is released through a control valve to blow the internal shape of the neck and the parison form.* The parison form is determined by the shape of the parison mould.

e. The neckring moulds in their spring loaded holders, supporting the partly formed bottle, are transferred (by No. 1 Operator) to the blow or finishing mould. No. 2 Operator lowers the blow head thereby releasing the valve which controls the compressed air supply. The bottle is then automatically blown to the shape of the finishing mould. The finished bottle is removed from the mould by No. 2 Operator who compresses the spring of the neck mould holders, automatically ejecting the bottle onto the table of the machine. From this point the bottle is carried to the annealing lehr.

5. Was human lung power used at any time in the production of the item numbers in question 3?—No. [Italics supplied.]

Appellant rested without offering further evidence, and the Government called as its witness Charles B. Garwood, a factory superintendent employed for approximately fifty-one years by Carl Lowery Company of Baltimore, a producer since 1888 of glass bottles, primarily, for the cosmetic and perfumes trades. The witness testified that originally all bottles produced in the factory were produced entirely by a glass blower, using the hand-blowing process. With respect to that process, the record discloses the following facts:

Q. Will you please describe, briefly, the hand-blowing process?—A. Well, he had a hollow pipe then he would gather a certain amount of glass on the end, the hop end of the pipe, the proper amount to make a bottle. Then we furnished him with certain tools to work with. He would have what they called a "block" that he would shape that piece of glass in on the end of a hollow rod. He would blow into it. He had an iron plate that he would roll it on to shape it as near the right shape he could [to] go into the blow mold. He possibly would flatten it on

the two sides so he could make a flat bottle out of it. Then he would place it in the mold, the boy would close it, and he would blow with his mouth and expand that hot glass to the shape of the bottle mold. That was the hand-blowing process.

Presiding Judge OLIVER: After it was blown in the mold, then what happened after that?

The WITNESS: Well, he would pull his pipe up and there would be a fine piece of glass there and the boy would leave it there until it was properly cooled so it wouldn't go out of shape. He would move it out, and pass it on up to a boy that would put it into a holder with the neck end sticking out, put it into a hot oven—we called them "blow molds"—to re-heat, and then another skilled man would finish it off with finishing tools, make the sides and the cork end, and the outside finish, and when it was turned out, it was carried to the annealing oven.

Presiding Judge OLIVER: Is that what is known as a "lehr"?

The WITNESS: That is a lehr or an oven, just so it can be properly annealed.

The witness further testified that his company gradually progressed from the production of bottles exclusively by the hand-blowing process so as to include the process of producing bottles by an automatic machine. The first step in that direction consisted of acquiring, in the early 1920's, some machines which produced the bottles with the aid of three men. The three-man machine eliminated the individual glass blower and compressed air was used "instead of where the blower had his pipe, and blowed in the pipe to put the bubble inside." Then it "gradually developed so that this machine would be more automatic, and it came out to be a two man machine." The next step, the Government's witness said, was from the two-man to the one-man machine. With respect to that machine, the following excerpt is quoted from the record:

Presiding Judge OLIVER: Am I correct in understanding that this machine you have now described, that one man machine as you have described it, that the machine was completely automatic except for the gatherer gathering the glob of glass and dropping it into the mold; is that right?

The WITNESS: That's right.

The next step forward from the one-man machine was the development of another machine consisting of a feeder device, or automatic feeder, which eliminated the gatherer who gathered the gob of glass and dropped it into the mold. The succeeding step was the annexation of a conveyor which removed the bottles from the one-man machine to the lehr, thereby making the machine fully automatic and eliminating the necessity for any labor in the production of the bottles.

The fully automatic machine, according to the description of the Government's witness, comprises a combination of the feeder, the bottle-forming machine, and the conveyor all "tied together" and synchronized from one end to another. That assembled equipment, the witness stated, when started first feeds the molten glass to the machine, then forms the bottle in certain molds by blowing a bubble of compressed air into the molten glass therein, and, finally, removes

the bottles so produced to the annealing oven or lehr where they are treated, stacked, and set down.

It further appears from the record that in the plant supervised by the witness both the fully automatic machines and a number of the one-man machines hereinbefore described are still employed in the production of bottles and apparently were so employed at the time the Tariff Act of 1930 was enacted.

Just how completely automatic the bottle producing machine has progressed in other nations of the world has not been fully established by the record, except that the merchandise here in issue was made in the three-man machine in England, and the machine in the *Riedel* case, *supra*, was a one-man machine, employed in Czechoslovakia.

The molten glass in the *Riedel* case was fed by hand, but the court held that the machine which actually produced the bottles (the bottle-forming machine) was automatic in its entire operation, and admittedly so.

The correctness of the decision in that case has not been challenged by counsel for the contesting parties in this appeal, but it is clearly apparent that the machine there involved was not a fully automatic machine. In rendering its decision the court held upon the facts presented, and in view of the legislative history of the statute and other documentary evidence, of which the court took judicial notice, that the machine was an automatic machine.

However, the court did not, as counsel for the Government here contends, judicially determine the meaning of the word "automatic" which meaning is to apply to all machines whenever the question arises pending a legislative enactment by Congress which changes the meaning that was given to the word in the *Riedel* case. That the word "automatic" has different meanings under different circumstances is evident from the number of cases judicially defining the word which have been cited by counsel for the respective parties in this appeal. From these authorities it is obvious that the term "automatic" is a relative term which, according to the situation presented, meant one thing in one case and something else in another. The court in the instant case must be guided in reaching its conclusion by the intent which the Congress had in mind when it made use of the term in the enactment of the statute. *United States et al.* v. *American Trucking Associations, Inc., et al.*, 310 U. S. 534, 542; *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078. That intent has been clearly defined.

Certain persons interested with respect to the proper duty to be levied on imported perfume bottles appeared before the Ways and Means Committee of the House in 1929 and testified relative to the proposed bill which dealt with the matter. The record of the hearings before the committee (Tariff Readjustment, 1929, 70th Congress,

2d Session, Vol. 2, pages 1369–70) discloses that Mr. Leach of the Carr-Lowrey Glass Company made the following statement:

In the first place, please bear in mind there are two methods of manufacturing bottles; one is known as the automatic machine method of manufacture, the other the human or hand-made process of manufacture. The latter method in this country, while quite small as compared to the total production of bottles, is extremely important as these bottles *manufactured by the skilled glass blower are more adapted for use for the manufacturing perfumer for the reason that they are of a high grade and of an artistic design, and are comparable with those bottles imported from France, Germany, and other foreign countries.* [Italics supplied.]

Referring to paragraph 218 (e), the Supplement to Tariff Information on items in the Tariff Bill of 1930 (H. R. 2667), so far as pertinent, reads as follows:

*Effect of changes in phraseology and rates.*—Under the bill as passed by the House, all articles covered by this subparagraph, whether or not made by automatic machine, would be subject to duty at the rate of 70 per cent. As modified by the Senate, separate rates are provided for bottles made by automatic machine and for those otherwise produced. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*Competitive conditions.*—At the present time four plants produce most of the domestic bottles, vials, and jars used as containers of perfume, talcum powder, and other toilet preparations. All of these plants produce such bottles by the so-called hand-blown method, but at least three of them produce a considerable quantity of perfume bottles by automatic or semiautomatic machines. \* \* \* [Italics supplied.]

No distinction in the rate of duty between the perfume bottles produced by the glass blower and those produced by automatic machine was made in the bill which the House Committee reported to the Senate. The Senate Finance Committee in its report accompanying the bill, 71st Congress, 1st Session, Report No. 37, page 9, made the following statement:

Machine production of glass bottles has for the most part displaced *the older hand-blown method of production,* and those produced by the latter method consist of types which have not as yet been successfully made by machines. An increased rate has been imposed upon bottles used as containers of perfume and toilet preparations *in order to perpetuate an industry which is practically the only source of employment for the comparatively few highly skilled glass-bottle blowers remaining in the trade.* [Italics supplied.]

The bottles to which the duty of 25 per centum ad valorem was to be applied, as hereinafter described, are the perfume bottles cheaply made by machinery, whereas the rate of duty at 75 per centum ad valorem was to be applied solely to the hand-blown bottles produced by the glass blower. We quote the following excerpts from the Congressional Record, 71st Congress, 1st Session, pages 5212 to 5217, and 2d Session, page 4951, the italics being here supplied:

Mr. Edge: As I think all Senators understand, previous to a very few years ago all of our bottle ware, jars, and so forth *were made by hand; in other words,*

*through the operation of the individual workmen known as glass blowers.* It is an industry that has had a very historic and artistic side as well as a practical one. * * *

\*    \*    \*    \*    \*    \*    \*

Mr. Edge: * * * The present duty is 55 per cent and the House suggests a duty of 70 per cent, while the Senate Finance Committee proposes to increase it to 82½ per cent. * * *

\*    \*    \*    \*    \*    \*    \*

Mr. Edge: I *desire to offer an amendment to the paragraph which will make perfectly clear the intent of the committee that the 82½ per cent rate shall apply alone to handmade bottles.* There has been some question—and I think perhaps there is basis for it—that the paragraph would also provide a duty of 82½ per cent on machinemade cologne bottles and other bottles of similar type. The amendment which I will offer will make *the 82½ per cent rate apply alone to bottles made by hand. I think that will meet many of the objections which I have heard from the importers.*

\*    \*    \*    \*    \*    \*    \*

Mr. Couzens: Mr. President, I offer as a substitute for the 82½ per cent on line 2, page 46, "75 per cent."

The Vice Pres.: There is an amendment already pending.

Mr. Couzens: Who offered it?

The Vice Pres.: The Senator from New York (Mr. Copeland).

Mr. Smoot: I will ask the Senator from New York if he will not withdraw that amendment.

Mr. Couzens: I forgot that the Senator from New York had an amendment pending. I offer, as a substitute, 75 per cent. I ask the Senator from New York if that is agreeable?

Mr. McKellar: Mr. President, will the Senator from Michigan yield? I want to ask the Senator whether his amendment applies *solely to handblown bottles and stoppers?*

Mr. Couzens: Absolutely.

Mr. McKellar: It does not apply generally, as in the amendment offered by the Senator from New York?

Mr. Couzens: No; *solely to hand-worked* glass.

\*    \*    \*    \*    \*    \*    \*

Mr. Copeland: Mr. President, if I may have the attention of the Senator from Utah (Mr. Smoot) and my colleagues on this side of the Chamber, when the matter of bottles came up the first time, the then Senator from New Jersey, Mr. Edge, was very anxious to have the rate on ground glass bottles, hand blown, raised to 82½ per cent. I resisted that, and then made a very stupid error. I asked that the rate be made 75 per cent on the hand-blown and then insisted that 65 per cent should be put upon automatic machine-made bottles. *Those are very cheaply made and are used in every 5 and 10 cent store, the little bottles for perfumery that are sold in those stores being made in this way by machinery.* The next time the matter came up, after some discussion, the rate was fixed on the automatic machine-made bottles at 40 per cent. They are now coming in at 50 cents a gross. My amendment is to change the rate on automatic machine-made bottles to 25 per cent * * *.

\*    \*    \*    \*    \*    \*    \*

Mr. Copeland: * * * Here is the reason why I propose to put any rate on at all: *I am anxious that the bottle blowers of New Jersey and Maryland should*

*be given this protection,* but if we make the rate so high on the automatic machine-made bottles, then it throws all of the traffic into hand-blown bottles. * * *

The Congress was familiar, as hereinbefore described, with the fact that at and prior to the enactment of the Tariff Act of 1930 machine-made bottles were manufactured by machines some of which were fully automatic while others were only semiautomatic. Nowhere in the hearings or in the extensive debate on the bill in the Congress, however, was any reference or suggestion made, so far as the matter has been brought to the court's attention, that the rate of 25 per centum ad valorem was to be imposed on bottles produced solely by machines which were fully automatic and that the rate of 75 per centum was to be imposed on those bottles which were produced by the semiautomatic machine.

Obviously, there would have been no sense in fixing one rate of duty for imported bottles produced by the fully automatic machine and a rate three times as high on bottles produced by the semi-automatic machine, *since the highly skilled American glass blower and the product of his labor were nowise involved in competition with the product of either class of machine.* Moreover, had the Congress intended to impose the higher rate of duty on bottles produced by the semiautomatic machine, it would have been quite a simple matter for it to have said so.

The bottles submitted at the trial of the instant case represent no such quality of merchandise as that produced by the American glass blower, but are of the cheaper variety produced by automatic or semiautomatic machine. No highly skilled glass blower was employed in the production of the bottles, and only ordinary labor, outside of the gatherer who fed the gob from the forehearth, as in the *Riedel* case, was employed in the production of the imported merchandise. Therefore, it is our opinion that the involved bottles were produced by "automatic machine" within the purview of the statute and were entitled to be assessed with duty at the rate of 25 per centum ad valorem as therein provided.

In view of that conclusion, it is deemed unnecessary to discuss other points raised in the arguments of counsel. Accordingly, for the reasons stated, the judgment of the United States Customs Court is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.

HATFIELD, Judge, specially concurring.

I am in entire agreement with the opinion written by Judge O'Connell. The term "automatic," as used in paragraph 218 (e) of the Tariff Act of 1930 is ambiguous and the court not only has the right but the duty to look to the legislative history and to other pertinent authorities in order to determine just what the Congress intended by the language "automatic machine." Furthermore, I think the

phrase, *"produced* by automatic machine" (italics mine), is also ambiguous and requires careful consideration as to the interpretation intended to be placed upon it by the Congress.

It is clear, I think, from the legislative history quoted in Judge O'Connell's opinion, and by the amendments introduced by the late Senator Copeland to the paragraph then pending in the Senate, that the terms "automatic machine" and "machine-made bottles" were used synonymously, and that it was the intent of the Congress to place the rate of duty of 75 per centum ad valorem on hand-blown bottles and 25 per centum ad valorem on machine-made bottles. It certainly was not the intent of the Congress to place a duty of 75 per centum ad valorem on so-called machine-made bottles in order to protect the manufacturer of bottles made on the so-called automatic machine.

It appears from page 5217 of the Congressional Record; 71st Congress, First Session, that the late Senator Copeland made, among other things, the following statement, which is not quoted in Judge O'Connell's opinion:

Mr. COPELAND. * * * I propose this: That on line 2, page 46, the comma and the rest of the sentence be stricken out and that we insert the words "if produced by automatic machine, 65 per cent ad valorem, and when not so produced the rate shall be 75 per cent ad valorem."

* * * It is not right that the same rate should be placed upon the automatically made bottle as is placed on the bottle which is *hand blown.* If we are here to try to serve the public, I believe we may by the addition of 10 per cent to the present rate, which is 55 per cent, give encouragement to the production of *the machine-made bottle and at the same time protect the maker of the hand-blown bottle.* [Italics supplied.]

It is true that the machines in the instant case, which partly produced the bottles in question, are not fully automatic and that there were machines in this country at the time of the passage of the Tariff Act of 1930 which produced partly finished bottles and which were fully automatic. I quote from Machinery's Encyclopedia, Vol. 1, pages 178–179, the following statement with regard to the classification of automatic and so-called semiautomatic machines:

*Classification of Automtic Machines.*—The term "automatic," as applied to various classes of machine tools, does not always have the same meaning, and a machine which one manufacturer classifies as automatic, would be considered semi-automatic by another manufacturer * * *.

*Automatic and Semi-automatic Machines.*—From the foregoing, it will be seen that the term "automatic" is a relative one as applied to machine tools generally. * * * When a machine is capable of automatically producing duplicate parts repeatedly, it is universally referred to as automatic, whereas, if it simply performs a complete cycle of machining operations, but requires the attention of an operator each time a part is finished, it may be considered automatic by some, and semiautomatic by others. In some cases, a machine of the latter class is termed *"automatic,"* while one that is capable of continuous operations is known as *"fully automatic".* [Italics supplied.]

The language in paragraph 218 (e), *supra*, "produced by automatic machine, 25 per centum ad valorem," is further ambiguous because of the word "produced" contained therein. It has been suggested that the machines involved in the instant case are not machines at all. I assume it is meant by that suggestion that, as the glass bottles formed by the involved machines are manually removed to an annealing oven for the annealing process which, it clearly appears from the record is a necessary process in the production of glass bottles, the involved machines do not produce the involved glass bottles. The answer to that suggestion is that if the involved bottles were not produced by machine, for the reasons stated, then it can be said with equal propriety that bottles are not produced by a so-called automatic machine.

It appears from the testimony of Charles B. Garwood, who testified for the Government, that he was factory superintendent of the Carl Lowery Glass Company of Baltimore, Maryland, and that he had been associated with that company for 51 years. The witness testified that in the hand-blowing process, the glass blower used a hollow pipe with which he would gather a sufficient amount of glass to make a bottle; that the glass blower was furnished with certain tools; and that

* * * He would have what they called a "block" that he would shape that piece of glass in on the end of a hollow rod. He would blow into it. He had an iron plate that he would roll it on to shape it as near the right shape he could to go into the blow mold. He possibly would flatten it on the two sides so he could make a flat bottle out of it. Then he would place it in the mold, the boy would close it, and he would blow with his mouth and expand that hot glass to the shape of the bottle mold. That was the hand-blowing process.

The witness further stated that after the glass was expanded to the shape of the bottle mold, the glass blower's blow pipe was removed, the bottle was left in the mold until it cooled, so that it would not lose its shape, and thereafter it was taken to an annealing oven, or lehr, to be properly annealed. The witness also stated that in the automatic machine, the glass is fed automatically into a parison mold and that after the bottle is formed automatically, it is taken from the machine automatically onto a conveyor which takes the bottle to an annealing oven where it is properly annealed.

According to Webster's New International Dictionary, the word "anneal" is defined as follows:

To subject to high heat, with subsequent cooling, for the purpose of softening thoroughly and rendering less brittle. In some cases, as for glass or steel, the cooling must be gradual; in others, as for copper and brass, it may be sudden. It is believed that annealing reduces brittleness by removing strains that have been induced in the material by some previous treatment.

To interpret literally the language "produced by automatic machine," would lead to absurd and unreasonable results clearly not contemplated by the Congress. Had the Congress used the language

"produced by *fully* automatic machine," a different situation would be presented. So, we think it is proper in the instant case to look beyond the language used by the Congress in order to understand its purpose. Authority for our right and duty to do this is very clearly set forth in *United States et al.* v. *American Trucking Associations, Inc. et al.*, 310 U. S. 534, 543–544.

I am of the view, as stated in Judge O'Connell's opinion, that it was the purpose of the Congress to place a duty of 75 per centum ad valorem on glass bottles produced by the glass blower, and 25 per centum ad valorem on machine-made bottles, although the Congress did not use the term "machine-made" nor did it use the term "fully automatic" in paragraph 218 (e), *supra*, and that it was not intended to provide a 75 per centum ad valorem duty on bottles produced by a hand-operated machine, which does not involve the skill and labor of the highly skilled glass blower, in order to protect the manufacturers of bottles produced by *fully* automatic machines.

JACKSON, Judge, dissenting, with whom JOHNSON, Judge, joins.

I am gravely concerned over the disposition of this appeal and feel impelled to protest against the decision of the majority as being illogical and unsound.

I have endeavored to the utmost of my ability to find some rational basis for the conclusion of the majority, but I must confess my failure in that respect.

It appears to me that, by the decision of the majority, the will of Congress, as expressed in the involved statute, has been distorted from its plainly expressed intention.

There are forty-four protests included in this case, all of which are directed against the assessment of duty on certain glass bottles, exported from England, at 75 per centum ad valorem pursuant to paragraph 218 (e) of the Tariff Act of 1930. In the protests the merchandise was claimed to be dutiable at 25 per centum ad valorem under the same paragraph, the pertinent portion of which reads as follows:

PAR. 218. (e) Bottles and jars, wholly or in chief value of glass, * * *; all the foregoing *produced by automatic machine*, 25 per centum ad valorem; *otherwise produced*, 75 per centum ad valorem. [Italics ours.]

The judgment appealed from was made by a divided court, the majority opinion holding that the involved merchandise was produced otherwise than by an automatic machine and the dissenting opinion stating that the instant case is not distinguishable from the case of *Jos. Riedel Glass Works, Inc.* v. *United States*, 12 Cust. Ct. 173, C. D. 849, the judgment in which case was affirmed by this court. *United States* v. *Jos. Riedel Glass Works, Inc.*, 32 C. C. P. A. (Customs) 201, C. A. D. 307.

In the dissenting opinion it is stated that the manual work performed in producing the involved merchandise can not be characterized as "productive," and that "The gatherer" merely supplies or feeds the material, molten glass, into the machine and the so-called operators supplied power to the machine, whose automatic operation produced the bottles under consideration.

In the principal brief for appellant, counsel, paralleling the reasoning expressed in the dissenting opinion, contends that the manual work performed in the production of the involved merchandise is not productive; that the testimony offered on behalf of the Government is incompetent and immaterial, and at best opinion evidence of interested witnesses and without weight in determining the common meaning of the words of the statute; and that the involved bottles were produced by an "automatic machine," as that term was construed by this court in the *Riedel* case, *supra*. A supplemental brief was filed in which it was contended that it was not the intention of Congress to apply the rate of 75 per centum ad valorem to any articles mentioned in the involved paragraph except those produced by a glass blower; i. e., a hand-produced article wherein the blowing was done by human breath. It is stated in that brief that in the *Riedel* case, *supra*, this court found it unnecessary to review the legislative history referred to by the trial court in its decision therein, but it is also said that the statement in its decision,

Suffice to say, that aside from the question of revenue, the intent of Congress as demonstrated by the legislative history of the statute was to protect American glass blowers against the competition of lower-paid glass blowers of other nations by providing a duty of 75 per centum ad valorem for all bottles produced otherwise than by automatic machine.

should control the decision here.

Much of the legislative history pertaining to the involved paragraph was quoted in the supplemental brief in which it is further contended that irrespective of legislative history, the machines producing the involved merchandise were automatic machines.

The involved paragraph is new in the Tariff Act of 1930, and was first interpreted in the *Riedel* case, *supra*. In that case atomizer bottles, toilet water bottles, and perfume bottles were imported at the port of New York from Czechoslovakia. They were classified by the collector at the rate of 75 per centum ad valorem as having been produced otherwise than by an automatic machine. The protest claimed that the merchandise was properly dutiable at 25 per centum ad valorem as "bottles produced by automatic machine."

It is apparent that the issue here involved is the same as that which was involved in the *Riedel* case, *supra*. The record there disclosed—it was conceded by the Government—that the actual forming

of the molten glass into bottles was an automatic process. The Government, however, contended that the bottles were not produced by an automatic machine because the molten glass was fed into it manually by a workman known as a gatherer. It was clear in that case that the process of producing the bottles was entirely automatic in that after the material had been fed into the machine no human agency intervened between that stage and the stage whereat the completed bottle was ejected from the machine. Because of the facts just stated, the trial court held that the involved merchandise was produced on an automatic machine.

Upon appeal by the Government, the judgment of the trial court was affirmed. *United States* v. *Jos. Riedel Glass Works, Inc., supra.* In our opinion there we quoted the following definition from Webster's New International Dictionary, Second Edition, 1936, p. 204

*automatic machine.* A machine or machine tool which, after once being set, operates automatically *except for applying the power, lubrication, supplying material, and shutting off the power.* [Italics ours.]

We held that the machine which produced the imported merchandise fell squarely within that dictionary definition and accordingly affirmed the judgment of the trial court. We made no reference to the legislative history of the paragraph, except to state that it was the intent of Congress to protect American glass blowers against competition by lower-paid glass blowers of other nations by providing the higher rate of duty for all bottles produced otherwise than by an automatic machine. That brief reference to legislative history, in my opinion, was entirely unnecessary for decision, because the complete reason for our conclusion was that the imported merchandise was produced upon an automatic machine measured by the common meaning of that term, as it appears in the dictionary definition above quoted. In other words that reference was *obiter dicta.*

Apparently for the reason that it was the first judicial review of paragraph 218 (e), and for no other reason I can see, the trial court in that case, in concluding that the merchandise was produced on an automatic machine, deemed it appropriate to set out in some detail the legislative history. The presiding judge, who delivered the opinion of the court, quoted from the Congressional Record, 71st Congress, 1st Session, pages 5214, 5215; the records of hearings on the tariff bill before the Committee on Ways and Means, Tariff Readjustment, 1929, Vol. II, pages 1366, 1369, and 1370; the Supplement to Tariff Information on items in Tariff Bill of 1930 (H. R. 2667) with respect to paragraph 218 (e); the brief submitted to the Committee on Ways and Means by the Glass Container Association of America, Tariff Readjustment, 1929, Vol. II, page 1363; the findings by the Department of Labor appearing in a publication, No. 441,

under the heading "Productivity of Labor in the Glass Industry"; a special pamphlet from the Department of Justice prepared in 1938 for the use of the Temporary National Economic Committee; the Encyclopaedia Britannica, 14th Ed., Vol. 2, page 785, and Vol. 3, page 955; *Modern Glass Practice*, by S. R. Scholes, published by Industrial Publishers, Inc., Chicago, 1941; *Machinery's Encylopedia*, published by Industrial Press at New York, 1917, Vol. 1, page 178. Thus it will be seen that the trial court in that case made extensive research into the legislative history pertaining to the paragraph and also consulted other publications as to the proper meaning to be attached to the expression "automatic" in that case.

In the instant case, counsel for appellant merely introduced in evidence certain interrogatories and cross interrogatories propounded to and answered by the Managing Director of the International Bottle Co. Ltd. of London, England, with respect to the process by which the involved merchandise was produced. In his answers it was stated that: "Molten glass is transferred, by a gatherer using a solid gathering iron, from the furnace to the parison mould to which are fitted the neckring moulds."; "No. 1 Operator cuts off sufficient glass which, by means of vacuum created by continuously working pumps to which the machine is connected, is automatically sucked into the neck moulds. This operation forms the aperture, the brim and the external shape of the neck of the bottle."; "The quantity of glass is largely determined by the size or capacity of the parison mould and also partly by the point at which the operator cuts the glass from the gathering iron."; "Compressed air, supplied from power driven compressors, is released through a control valve to blow the internal shape of the neck and the parison form. The parison form is determined by the shape of the parison mould." and "The neckring moulds in their spring loaded holders, supporting the partly formed bottle, are transferred (by No. 1 Operator) to the blow or finishing mould. No. 2 Operator lowers the blow head thereby releasing the valve which controls the compressed air supply. The bottle is then automatically [mechanically] blown to the shape of the finishing mould. The finished bottle is removed from the mould by No. 2 Operator who compresses the spring of the neck mould holders, automatically [mechanically] ejecting the bottle on to the table of the machine. From this point the bottle is carried to the annealing lehr."

No further evidence was offered on behalf of the appellant. The Government produced two highly skilled and long experienced witnesses in the bottle producing industry, one of whom testified at great length concerning the development of the production of bottles from the hand-blown stage to the development of an automatic machine wherein the feeding thereof was done by mechanical power.

Both witnesses testified that they had seen bottles manufactured and produced in the same manner as described in appellant's evidence. One witness testified without contradiction that a machine, such as was alleged to have produced the imported merchandise, is not an automatic machine, but that it is a hand-operated machine. It was agreed by the parties after the second witness had been duly qualified and had stated he had seen bottles produced in the same manner as that described in plaintiff's evidence, that he would in all other respects testify in accord with the testimony given by the first witness. He was not further interrogated.

It may be here observed that nowhere in the record appears a description of the machine or machinery by means of which the involved merchandise was alleged to have been made. Therefore, we cannot know its structure.

It appears in the deposition that the machines said to be employed were of the "Schiller" type. It was said that such machines are incapable of being identified by serial numbers or otherwise and I have not found a bottle making machine bearing that name referred to in any of the many treatises of the bottle making art I have examined. In the process described in the depositions, I do not find any clear basis for concluding that the bottles were made on what is commonly known as a machine. A definition typical of those found in the various dictionaries appears in Funk and Wagnalls New Standard Dictionary of the English Language, page 1483, as follows:

machine, n. 1 Any combination of inanimate mechanism for utilizing or applying power. Specif.: (1) a construction for mechanical production or modification, generally complicated, and involving more than one mechanical principle, as an arrangement of gears, cranks, connecting-rods, etc.

Definitions from what appear to be high authority, more detailed but substantially the same as that just quoted, are found in *A History of Mechanical Inventions*, by Abbott Payson Usher, Associate Professor of Economics, Harvard University, on page 66, as follows:

Every machine will be found to consist of a train of pieces connected together in various ways, so that if one be made to move, they all receive a motion, the relation of which to that of the first is governed by the nature of the connection.

A machine is a combination of resistant bodies so arranged that by their means the mechanical forces of nature can be compelled to do work accomplished by certain determinate motions.

All that can reasonably be gathered from the record on behalf of appellant is that there is a reservoir of some kind containing molten glass. A gatherer, by means of a rod held in his hands, brings a gob of such glass to a parison mould which is fitted with a neckring mould. When that has been done, another man, called operator No. 1, clips off enough of the gob for the finished bottle. Then the gob is sucked

into the neck mould by means of a vacuum created by continuously working pumps. That operation, it is said, forms the aperture, the brim, and the external shape of the neck of the bottle. After that operation, the holder supporting the partly formed bottle is taken from its position by that operator to another means called a blow or finishing mould. There is nothing in the record from which it can be inferred that the second mould has any cooperative relationship with the first mould or that it is part of the apparatus comprising the first mould. After the partly formed bottle in its mould has been transferred to the second mould, another operator by manual means lowers the "blow head" thereby releasing the valve controlling compressed air which passes into the second mould, blowing the article into its final form, which is the interior shape of the finishing mould. The article thus formed is taken from the second mould by the second operator, who by compressing a spring on the neck mould holder releases the formed article, which is ejected onto a table. From there it is carried by human means to the annealing lehr. In the lehr the article is again heated and then allowed to cool slowly. Then and only then is a bottle, as known to commerce, completed.

From the description of the process just related, it is clear that nothing can be found therein which may be said to show "a train of pieces connected together in various ways, so that if one be made to move, they all receive a motion, the relation of which to that of the first is governed by the nature of the connection." As a matter of fact it clearly appears that there is no mechanical connection or cooperation between the first means by which the neck portion of the bottle is formed and the second means by which the form of the bottle is finished. Therefore, in my opinion, it has not been shown by appellant that the means by which the involved merchandise was made is in reality a machine.

*A fortiori*, the successive intervention of human agency in the production of the bottle and *without which no bottle could possibly be made*, even granting that the bottle was made on a machine, convinces me conclusively that the imported goods were not produced by an automatic machine.

Reverting to the definition of an automatic machine appearing in our opinion in the *Riedel* case, *supra*, which we quoted with approval, it is utterly incomprehensible to me how the majority can square the machine, assuming that one has been disclosed herein, with that definition. As I view it, the apparatus by which the involved merchandise was produced is no more an automatic machine than a pancake griddle. There a measured quantity of batter is placed on the griddle. After the cake has been cooked on one side, it is turned manually and cooked on the other side. When it has been cooked on both sides, it is removed by hand as a finished article.

The meaning of the word "automatic," I feel certain, is commonly known to every school boy and girl over the age of ten years. The definition of the word appearing in Corpus Juris Secundum, Vol. 7, at page 1296, is clear and in accordance with all other definitions thereof that I have been able to find. It reads as follows:

AUTOMATIC. Self-acting; or the elimination of human agency or volition, which results in the saving of labor and increases certainty and uniformity of operation; having an inherent power of action or motion, self-acting or self-regulating, not voluntary, not depending on the will, mechanical.

Because an automatic machine in its action functions automatically, we find in the same authority on page 1297 the following definitions:

AUTOMATICALLY. Acting without the continued application of human agency or volition, that is, as opposed to acting rationally or volitionally; of its own accord; self-acting.

Clearly, the production of the involved merchandise, as appears in this case, can not possibly be ascribed to a machine which would conform to the structure or operate in accordance with the just quoted definitions.

While there is but little judicial pronouncement defining the words "automatic" and "automatically," we find in the case of *Tripp Giant Leveler Co.* v. *Rogers et al.,* 61 Fed. Rep. 289 (C. C. D. Mass. 1894) that a claim was sustained in a patent infringement suit wherein the defense alleged invalidity of the patent for want of novelty. In its opinion, the court pointed out that while the constituent elements of the machine were old, that this patentee was the first to combine its elements in such fashion as to cause them to function in unison. The patent was held valid because it disclosed a process by which certain machines were made automatic. In defining the word automatic, the court at page 290 stated as follows:

* * * By automatic is meant self-acting, or the elimination of human agency or volition, which results in the saving of labor, and increased certainty and uniformity of operation. This is the sense in which the term is used in the mechnical arts and in the patent law, and I cannot agree with the position of defendant's expert who seeks to detract from the merits of the Cutcheon invention by maintaining the broad doctrine that all contrivances are automatic which are operative for the purposes designed under any applied force, whether muscular or otherwise, and which, therefore, include a wheelbarrow and hand press in the category of automatic machines.

The circuit court of the district of New Jersey in the case of *Cleveland Target Co.* v. *Empire Target Co. et al.*, 97 Fed. Rep. 44, 74 (C. C. D. N. J. 1899) quoted its interpretation of the term as follows:

* * * The term "automatic" is constantly applied to valves, although their action depends on the pressure of liquids or other fluids against them. So the operation of automatic car couplers is dependent on the action on them of the parts to be coupled. In *Westinghouse* v. *Brake Co.*, 170 U. S. 537, 545, 18 Sup. Ct. 711, the court speaking of car-brake couplings said:

"These coupling were automatically detachable; that is, while they kept their grip upon each other under the ordinary strain incident to the running of the train, they would readily pull apart under unusual strains, as when the car coupling broke and the train pulled in two."

The circuit court of appeals of the first circuit in the case of *American Roll Gold Leaf Co. et al.* v. *W. H. Coe Mfg. Co. et al.*, 212 Fed. Rep. 720, 724 (C. C. A. 1st 1914) had the following to say with respect to the term "automatically":

The word "automatically," as applied to mechanism, is in common use and is unambiguous. It means "self-acting," and it implies a certain cycle of movements which the machine itself makes without outside control. This cycle may be simple or complex. In the development of many machines there can be traced a constantly increasing extent of automatism; by which is meant that many steps or processes, which formerly had to be started, stopped, or controlled by the operative, are now started, stopped, or controlled by the machine itself.

In the case of *Johnson* v. *Southern Pacific Company*, 196 U. S. 1, it was held that automatic couplers on railroad cars are those which couple automatically by impact without men going between the cars.

I am firmly of the opinion, in view of what has hereinbefore been said, that it cannot possibly be properly held that the involved merchandise comes within the purview of having been produced on an automatic machine.

The opinion in the *Riedel* case, *supra*, and the prevailing opinion in the present case were written by the same judge of the trial court. In my opinion both carefully considered and logically written opinions are based on sound sense and sound law. The facts in the *Riedel* case, *supra*, and those in the instant case were clearly and properly distinguished in the trial court's opinion in the instant case. Since I agree with the reasoning of the trial court, I am in direct opposition to the reasoning employed by the majority here.

I can not see, nor does the opinion of the majority point out, why the following language appearing in the opinion of the trial court should not be approved and adopted by us.

\* \* \* The Congress did not use language separating these bottles into "hand-blown" at one rate and "machine-made" at the lower rate, nor did it choose to select the "hand-blown" type for greater protection and relegate those "otherwise produced" to the lower rate. The Congress presumably for good and sufficient reasons, chose the language now found in paragraph 218 (e) "produced by automatic machine." It is not within our province to make the laws. We may not substitute our opinion for the written statute. We must apply the language which was actually used by the Congress and have no right to give any meaning to such language other than that conveyed by the words, terms, or expressions in which the legislative will was expressed. (*Edgar Allen Steel Co. (Inc.) et al.* v. *United States*, 16 Ct. Cust. Appls. 26, page 29, T. D. 42715.) We are of the opinion that as the statute is now worded we must find the bottles before us not to have been produced on an *automatic* machine. We have already held to be *automatic* a machine which did not have the molten glass automatically fed to the machine, but which thereafter operated automatically. We may not substitute for the words of the statute "produced by automatic machine," the

words "produced by machine." To do so would be to invade the legislative functions of the Congress. In so holding, we are mindful of the language of our appellate court in concluding its opinion in the *Riedel* case, *supra*. It said:

\* \* \* Suffice to say, that aside from the question of revenue, the intent of Congress as demonstrated by the legislative history of the statute was to protect American glass blowers against the competition of lower-paid glass blowers of other nations by providing a duty of 75 per centum ad valorem for all bottles produced otherwise than by automatic machine.

We do not understand that our appellate court by use of the above-quoted language intended to indicate that only hand-blown bottles were to be subject to the higher rate of duty. We are of opinion that as the provisions of paragraph 218 (e) now stand, the only imported glass bottles subject to the lower duty (25 per centum) are those which are "produced by *automatic* machine." [Italics quoted.]

It seems to me no other reasonable conclusion can be drawn from a reading of the opinion of the trial court than that Congress intended in enacting the involved statute, not only to protect the manual glass bottle blowers, *which it certainly did*, but also to favor producers of bottles made on an automatic machine by fixing a duty on such product and placing a higher rate of duty on articles otherwise produced in any manner. If it can properly be held that a supposed machine, which produced the bottles herein, is an automatic machine, despite the fact that in order to produce a bottle on that machine it is absolutely necessary to have three steps therein performed by manual labor after the gob is fed into the first mould, we should not hestitate to term a machine automatic which is entirely operated by human means except for a single machine step. In my opinion, the involved paragraph is clear and unambiguous and should not be, as is done by the majority, twisted into something that it does not mean by resort to legislative history. The United States Supreme Court in discussing resort to legislative history stated in the case of *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77, 83, as follows:

\* \* \* In proper cases, such reports are given consideration in determining the meaning of a statute, but only where the meaning is doubtful. *They cannot be resorted to for the purpose of construing a statute contrary to the natural import of its terms. Wisconsin R. R. Commn.* v. *C., B. & Q. R. Co.*, 257 U. S. 563, 588–589; *Penna. R. Co.* v. *International Coal Co.*, 230 U. S. 184, 199; *Van Camp & Sons* v. *American Can Co.*, 278 U. S. 245, 253. Like other extrinsic aids to construction their use is *"to solve,* but not *to create an ambiguity." Hamilton* v. *Rathbone,* 175 U. S. 414, 421. Or, as stated in *United States* v. *Hartwell,* 6 Wall. 385, 396, *"If the language be clear it is conclusive. There can be no construction where there is nothing to construe."* [Italics ours, except solve and create.]

In the case of *Addison et al.* v. *Holly Hill Fruit Products, Inc.*, 322 U. S. 607, the Court said:

\* \* \* After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.

Of similar import are the following cases in this court. *Armand Schwab & Co., Inc.* v. *United States*, 32 C. C. P. A. (Customs) 129, C. A. D. 296; *Thorens, Inc.* v. *United States*, 31 C. C. P. A. (Customs) 125, C. A. D. 261; *United States* v. *R. F. Downing & Co.*, 17 Ct. Cust. Appls. 194, T. D. 43645; *Woolworth Co.* v. *United States*, 13 Ct. Cust. Appls. 176, T. D. 41037; *United States* v. *Davies Co.*, 11 Ct. Cust. Appls. 392, T. D. 39317; and the 14 cases, commonly known as the "Five Per Cent Cases," 6 Ct. Cust. Appls. 291, T. D. 35508.

However, I am quite certain that the legislative history of the involved act clearly discloses an intent of Congress consistent with my views. The bill, as originally passed by the House, made no distinction between rates of duty on bottles, whether or not produced by an automatic machine. When the bill reached the Senate, an amendment known as "Amendment No. 222," was made to the bill. After the bill had been so amended, it went to conference, and there the House representatives accepted the bill as amended, as appears in the statement of the Managers on the part of the House, written in explanation of the effect of the action agreed upon by the conferees, and commented on in the conference report as follows:

AMENDMENT No. 222: The House bill imposed a duty of 70 per cent ad valorem on bottles and jars, wholly or in chief value of glass, of the character used or designed to be used as containers of perfume, talcum powder, toilet water, or other toilet preparations, and on bottles, vials and jars, wholly or in chief value of glass, fitted with or designed for use with ground-glass stoppers. The Senate amendment limits the application of the subparagraph in the case of bottles, vials, and jars, wholly or in chief value of glass, fitted with or designed for use with ground-glass stoppers, to such articles when suitable for use and of the character ordinarily employed for the holding or transportation of merchandise. It reduces to 25 per cent the duty on all articles in the subparagraph made by *automatic machine* and increases to 75 per cent the duty on such articles when *otherwise produced.* The amendment further provides that for the purposes of the subparagraph no regard shall be had to the method of manufacture of the stoppers or covers. The House recedes. (Conference Reports, Act of 1930.) [Italics ours.]

In Supplement to Tariff Information on items in Tariff Bill of 1930 (H. R. 2667) together with the reasons for the Senate amendments, the same information is set out.

I think it informative to repeat pertinent portions of the legislative history, as was set out in the opinion of the trial court in the *Riedel* case, *supra*, as follows:

In the Congressional Record, 71st Congress, First Session, at page 5214, Senator Edge stated:

Mr. EDGE. I desire to offer an amendment to the paragraph which will make perfectly clear the intent of the committee that the 82½ per cent rate shall apply alone to handmade bottles. * * * The amendment which I will offer will make the 82½ per cent rate apply alone to bottles made by hand. I think that will meet many of the objections which I have heard from the importers.

At page 5215:

Mr. EDGE. Of course, after the speech of the Senator from Tennessee it probably will not make any difference; but if the Senator wants the facts, let me say that this concern is a large concern—there is no doubt about that—but we are not discussing machinemade goods. The company represented by the witness no doubt has hundreds of machines, but the rate proposed does not apply to the goods made by machines or any importations of machinemade goods.—

    \*      \*      \*      \*      \*      \*      \*.

Mr. EDGE. If the Senator will pardon me for just a moment more, they are asking for a duty on handmade goods; and the particular plant referred to has a handmade branch, of course, but it also produces machinemade goods.

    \*      \*      \*      \*      \*      \*      \*

Mr. MCKELLAR. Mr. President, will the Senator from Michigan yield? I want to ask the Senator whether his amendment applies solely to hand-blown bottles and stoppers?

Mr. COUZENS. Absolutely.

Mr. MCKELLAR. It does not apply generally, as in the amendment offered by the Senator from New York?

Mr. COUZENS. No; solely to hand-worked glass.

At page 5217:

Mr. COPELAND. \* \* \*. I propose this: That on line 2, page 46, the comma and the rest of the sentence be stricken out and that we insert the words "*if produced by automatic machine*, 65 per cent ad valorem, and *when not so produced* the rate shall be 75 per cent ad valorem." [Italics ours.]

\* \* \*. It is not right that the same rate should be placed upon the automatically made bottle as is placed on the bottle which is hand blown. If we are here to try to serve the public, I believe we may by the addition of 10 per cent to the present rate, which is 55 percent, give encouragement to the production of the machine-made bottle and at the same time protect the maker of the hand-blown bottle.

In the record of the hearings before the Committee on Ways and Means, Tariff Readjustment, 1929 (Vol. II, page 1366) appears the following:

Mr. RAMSEYER. You agree with the witness who preceded you that there is no need for an increased tariff on machine-made bottles?

Mr. GAYNER. In so far as I understand it.

Mr. RAMSEYER. Do you agree with him that there should be some increase on hand-made bottles?

Mr. GAYNER. Absolutely; because with the machine-made bottles the labor element does not enter into it. The glass flows automatically into the machine. It is handled entirely by the machine and conveyed to the annealing lehr, and not touched by human hands until it is ready to be sorted and packed.

From a careful examination of the foregoing history and what I think is a proper understanding of the involved paragraph, it appears to me to be elementary that the framers of that paragraph intended to apply a low rate of duty to one type of bottle, namely that made by automatic machines.

Certainly it appears that Congress was apprized of the fact that several bottle producers in the United States produced bottles by automatic or semi-automatic machines. It is also clear from the record and must have been known by Congress that automatic bottle making machines were developed in the early 1920's. It further appears without contradiction in the record, and of which Congress must be presumed to have knowledge, that the method of operation, set out in appellant's case herein, is known in the United States as being performed by "hand operated machines." The record herein shows that the bottle making machines operated and regulated by *skilled craftsmen* in the art have been in common usage in the industry

since the early 1920's. It is further clear from the legislative history that the wording of the involved paragraph, with the exception of the rate of duty upon the two classes of bottles, is in substantially the same phraseology as that tendered by Senator Copeland, hereinbefore quoted, "if produced by automatic machine, 65 per cent ad valorem, and when not so produced the rate shall be 75 per cent ad valorem." This he stated, as hereinbefore set out, would "give encouragement to the production of the machine-made bottle and at the same time protect the maker of the hand-blown bottles."

It is very clear to me that Congress did intend to protect the hand glass blowers, which it certainly accomplished in writing the involved paragraph. It is also clear to me that in so doing, Congress had the further intention of protecting the skilled mechanics who operated the so-called hand machines or semiautomatic machines. This Congress did in clear, succinct, and unmistakable language.

The majority decision in my opinion runs foursquare against the judicial definitions given in the cases hereinbefore cited; is inconsistent with the universally known common meaning of "automatic" heretofore discussed; and legislative history has been employed to create an ambiguity, ignoring the plain, clear, and certain language of the statute.

I can not bring myself to agree with the philosophy of Little Buttercup, as it is in effect implicit in the majority opinion that "Things are seldom what they seem." Neither can I believe, as I would be compelled to believe if I agreed with the majority, that the Congress purposely, ignorantly, or inadvertently so masked its intent that we should "behold without seeing and hearing not understand."

As may be clearly discerned from the legislative history, Congress knew full well all about automatic and other machines and all about hand glass blowing in the bottle making art when the involved paragraph was worded. I am sure that Congress meant exactly what it said in well considered, plain, unambiguous language. Had it been its intention to legislate as the majority opinion holds, I feel that it would beyond all doubt have enacted the involved paragraph in the following or equivalent language:

Bottles and jars, wholly or in chief value of glass, * * * produced by hand blown method, 75 per centum ad valorem; otherwise produced, 25 per centum ad valorem.

After all, in considering statutes we must judge by the results and not by the various factors which may have determined legislative votes. It is the latter that I fear has influenced the majority.

I make bold to state that I believe this dissenting opinion and the prevailing opinion of the trial court are "as sound as the sea is salt" and "as conclusive as Mount Everest."

The judgment of the trial court should be affirmed.