(C. D. 849)

## Jos. Riedel Glass Works, Inc. v. United States

United States Customs Court, First Division

(Decided May 1, 1944)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*John J. McDermott,* special attorney), for the defendant.
*Lamb & Lerch* (*Kenneth G. Osborn* of counsel) *amici curiae.*

Before Oliver, Walker, and Cole, Judges

Oliver, Presiding Judge: This is an action brought to recover duties claimed to have been illegally exacted on certain atomizer bottles, toilet water bottles, and perfume bottles exported from Czechoslovakia and imported at the port of New York. The merchandise was classified by the collector as bottles produced otherwise than by automatic machine and duty was assessed at the rate of 75 per centum ad valorem under paragraph 218 (e) of the Tariff Act of 1930. All the bottles are claimed to be properly dutiable at 25 per centum ad valorem under the same paragraph as bottles "produced by automatic machine." Paragraph 218 (e) of the Tariff Act of 1930, which is the only paragraph involved in this case, reads as follows:

Par. 218. (e) Bottles and jars, wholly or in chief value of glass, of the character used or designed to be used as containers of perfume, talcum powder, toilet water, or other toilet preparations; bottles, vials, and jars, wholly or in chief value of glass, fitted with or designed for use with ground-glass stoppers, when suitable for use and of the character ordinarily employed for the holding or transportation of merchandise; all the foregoing produced by automatic machine, 25 per centum ad valorem; otherwise produced, 75 per centum ad valorem. For the purposes of this subparagraph no regard shall be had to the method of manufacture of the stoppers or covers.

The same issue as is here before us, with the same party-plaintiff, was before our court in protest 981062–G, in which case decision was rendered, Abstract 44552, 5 Cust. Ct. 360. The record in this previous case was incorporated in the record in the case at bar.

In the incorporated case, the president of the plaintiff corporation, Hans J. Weigl, testified that he had been in Czechoslovakia in the factories of the manufacturer, Joseph Riedel, Unter Polaun, Czechoslovakia. He testified that he had been in the Riedel plant in the years 1935, 1936, and 1937, the shipments there in question having been made in 1937. He also testified that he had observed the manufacturing process of bottles, in the Riedel plant similar to the bottles before the court in the former case, some of the item numbers being the same as in the case at bar. He stated that the machines which made these bottles were automatic in their operation insofar as the actual making of the bottles was concerned. He pointed out, however, that the proper quantity of molten glass to make a bottle was gathered on a pipe, sheared off, and fed to the machine by a skilled glass worker. From that point on to the point where the completed bottles were transferred to the annealing oven, the process was entirely automatic and no human labor was required after the molten glass was put in the machine. He described this machine as automatic.

The Government in the incorporated case introduced the testimony of a customs agent, Charles Turrill, who had inspected the Riedel plant in 1935 at which time he saw similar bottles made and saw the machine in operation making them. His description of the machine he saw differs materially from the process described by the witness Weigl. Witness Turrill testified that one workman gathered the molten glass, sheared it, and put that portion into a Parison mold; that a second workman operated the Parison mold by hand; that this second workman stepped on a lever which forced a plunger into the neck opening, forming the neck of the bottle; and that this same workman then released the plunger pulling a lever admitting air which formed the Parison or neck of the bottle. A third worker turned the bottle and carried it to a blower mold in which he placed the incompleted bottle, closing it and stepping on a lever which forced up a baffle plate for the bottom of the bottle. This third worker then forced a blow head on top of the bottle mold, clamping it tightly in place. Compressed air was then admitted automatically to the mold forming the completed bottle. The workman then opened the mold and removed the bottle to a table from which point it was carried by hand in baskets to the annealing oven. He testified that the annealing operation was automatic, the bottles slowly cooling as they were carried through the annealing oven. He further testified that the entire operation was hand labor except the admission of air into the blower mold. Mr. Turrill testified that hand-made bottles were made by a process different from that described above; that no glass blowers were used in making the bottles on this machine; and that he had seen all the machines in the Riedel plant but had seen no fully automatic machines there or in any country in Europe. He testified:

I mean by an automatic machine one that doesn't require any manual labor: that the process is automatic from beginning to end.

Presiding Judge McClelland asked the witness:

You start with the molten glass?
The WITNESS. Yes, sir.
Presiding Judge McCLELLAND. Is everything that follows done by machine?
The WITNESS. To my knowledge.

In addition to this testimony, the Government produced the testimony of a ceramic engineer, one Karl E. Peiler, connected with the glass industry. He testified that the bottles there before the court:

\* \* \* were made with a Parison mold, without a bottom. That would require manual skill and would not be automatic.

He further testified:

\* \* \*. The automatic machine supplies itself with glass from the furnace, and that glass that it supplies itself with is in a uniform quantity, and doesn't depend on human skill and judgment for its quantity. You must have an accurate quantity of glass, in regular succession.

The witness, referring to the machine described by the previous witness, Turrill, stated that he had seen similar machines in Germany in 1928 which he described as a Schiller bottle machine and which he claimed was not used in America. He claims the Schiller machine is not automatic because it depends on human skill to operate. It was the opinion of this witness that all of the exhibits were made by the Schiller process and hence not made on an automatic machine. The witness further testified as follows:

A. There aren't any automatic processes in use now that are not fully automatic, *if you include the feeding operation.* That is where the point of distinction would come.
X Q. Isn't there a process which is entirely automatic *after the molten glass is fed to the machine?*—A. Yes, sir.
X Q. Isn't that an automatic process?—A. It is automatic from then on, yes.
[Italics ours.]

The witness was questioned as to the type of machine described by Mr. Turrill and testified he had seen such a machine used to manufacture merchandise similar to exhibit 3 only; but not as to the others.

The Government's second witness in the incorporated case was a factory superintendent from an American bottle manufacturing plant who testified that he had seen similar bottles manufactured by the process described by the witness Turrill, in Germany in 1931. He stated that a Parison mold is necessary in the production of this kind of bottles. He also testified that for that type of bottle there was no baffle plate to indicate that the Parison mold was open at the top and therefore skilled manual labor was required to put the proper amount of air into the Parison mold. He further testified that he had seen bottles produced by automatic process at several plants in this

country. He claimed that an automatic bottle-making machine must have a continuous melting tank or furnace. The witness also testified that his plant had made similar bottles not automatically but by hand process stating that the lack of the baffle marks on the bottom of the bottles indicated to him that these were not made on an automatic machine. He stated that these bottles were made by an open-top Parison mold and described some of the bottles as having definitely been made in a four-part mold which would bar them from the automatic operation. This witness was last in Czechoslovakia in 1928 but had never seen any bottles produced there, his testimony being based entirely on his observation of bottles produced in the United States and countries other than Czechoslovakia. This witness testified that in his opinion a machine which is automatic in every feature other than the feeding of the glass would not be an automatic machine, his judgment being based upon his experience in the glass business in the United States.

In the decision in the incorporated case (reported as Abstract 44552), the court stated in part as follows:

* * *. The record would seem to indicate that none of the witnesses testifying for the Government ever saw the machines upon which the instant merchandise was produced. The witness who had visited these factories, after describing a non-automatic process or machine, was not able to swear that the instant bottles were made by such a process, and that they were not made by an automatic machine.

Without further discussion of the evidence in this case, suffice it to say that we are satisfied from an examination and consideration of all the credible testimony in this case, that the weight thereof establishes a prima facie case for the plaintiff, and that the bottles in question were made on an automatic machine. * * *.

The record in the case at bar has amplified the record in the incorporated case by additional testimony of the witness Weigl, called in behalf of the plaintiff and also examined by the defendant as its own witness. There was one additional witness for the Government. Some of the bottles in the case at bar are the same as those in the former case and the others are of the same general design and style. The witness Weigl testified that all these bottles were made on the same machine which he had described in great detail in the decided case. This we have heretofore described as a machine completely automatic in its operation except that the molten glass was gathered and fed to the machine by a skilled worker.

The witness Weigl, it is true, did not see all the bottles in the case at bar produced on the described machine and the Government's witnesses testified that in their opinion they could not have been produced on such a machine, giving in great detail their reasons in support thereof. The witness Turrill, who testified in the decided case, stated that his testimony in the case at bar would, if given, be the same as he gave in the previous action.

We are of opinion that the bottles in the case at bar were produced by the machine the witness Weigl described, and we so find. This conclusion, however, does not dispose of the principal question confronting us, which is whether or not such a machine, automatic except for the matter of the feeding of the raw material, is such an automatic machine as was contemplated by the Congress in enacting paragraph 218 (e) of the Tariff Act of 1930.

The provision for bottles "produced by automatic machine" and "otherwise produced" appeared for the first time in the Tariff Act of 1930. Congress did not specifically provide for "hand-blown" and "machine-made" bottles. Neither did it make any distinction between "fully automatic" and "semiautomatic" machines. It did, however, provide for a very great difference in the rate of duty. It assessed duty at 25 per centum on bottles "produced by automatic machine" and 75 per centum on bottles "otherwise produced." This new provision in the Tariff Act of 1930 is not free from ambiguity and as the master rule of construction is to ascertain the intent of Congress, we feel that we not only have the right, but the duty, to examine the legislative history to ascertain, if possible, the intent of Congress, and to reconcile such intent, if possible, with the language used in the statute. This being a new provision in the tariff act, we are fortified in our right to refer to the legislative history of the provision by the decision of our appellate court in *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. 96, T. D. 47080, where the court said (p. 105):

Paragraph 353, *supra*, is a new provision to tariff legislation. In order that we may properly interpret the portion of the same which is here under consideration, it becomes quite important that we review its legislative history with a view of ascertaining what Congress sought to accomplish by this new paragraph.

In the Congressional Record, 71st Congress, First Session, at page 5214, Senator Edge stated:

Mr. EDGE. I desire to offer an amendment to the paragraph which will make perfectly clear the intent of the committee that the 82½ per cent rate *shall apply alone to handmade bottles.* * * *. The amendment which I will offer will make the 82½ per cent rate *apply alone to bottles made by hand.* I think that will meet many of the objections which I have heard from the importers. [Italics ours.]

At page 5215:

Mr. EDGE. Of course, after the speech of the Senator from Tennessee it probably will not make any difference; but if the Senator wants the facts, let me say that this concern is a large concern—there is no doubt about that—but we are not discussing *machinemade goods.* The company represented by the witness no doubt has hundreds of machines, but the rate proposed *does not apply to the goods made by machines or any importations of machinemade goods.* [Italics ours.]

\*        \*        \*        \*        \*        \*        \*

Mr. EDGE. If the Senator will pardon me for just a moment more, they are asking for a duty on handmade goods; and the particular plant referred to has a handmade branch, of course, but it also produces machinemade goods.

\* \* \* \* \* \* \*

Mr. McKELLAR. Mr. President, will the Senator from Michigan yield? I want to ask the Senator whether his amendment applies solely to hand-blown bottles and stoppers?

Mr. COUZENS. Absolutely. ‥

Mr. McKELLAR. It does not apply generally, as in the amendment offered by the Senator from New York?

Mr. COUZENS. No; solely to hand-worked glass.

## At page 5217:

Mr. COPELAND. \* \* \*. I propose this: That on line 2, page 46, the comma and the rest of the sentence be stricken out and that we insert the words "if produced by automatic machine, 65 per cent ad valorem, and when not so produced the rate shall be 75 per cent ad valorem."

\* \* \*. It is not right that the same rate should be placed upon the automatically made bottle as is placed on the bottle which is hand blown. If we are here to try to serve the public, I believe we may by the addition of 10 per cent to the present rate, which is 55 per cent, *give encouragement to the production of the machinemade bottle and at the same time protect the maker of the hand-blown bottle.* [Italics ours.]

In the record of the hearings before the Committee on Ways and Means, Tariff Readjustment, 1929 (Vol. II, page 1366) appears the following:

Mr. RAMSEYER. You agree with the witness who preceded you that there is no need for an increased tariff on machine-made bottles?

Mr. GAYNER. In so far as I understand it.

Mr. RAMSEYER. Do you agree with him that there should be some increase on handmade bottles?

Mr. GAYNER. Absolutely; because with the machine-made bottles the labor element does not enter into it. The glass flows automatically into the machine. It is handled entirely by the machine and conveyed to the annealing lehr, and not touched by human hands until it is ready to be sorted and packed.

## Mr. Leach of the Carr-Lowrey Glass Co., stated (pages 1369/70):

In the first place, please bear in mind there are two methods of manufacturing bottles; one is known as the automatic machine method of manufacture, the other the human or hand-made process of manufacture. The latter method in this couutry, while quite small as compared to the total production of bottles, is extremely important as these bottles *manufactured by the skilled glass blower* are more adapted for use for the manufacturing perfumer for the reason that they are of a high grade and of an artistic design, and are comparable with those bottles imported from France, Germany, and other foreign countries. [Italics ours.]

It is thus made clear that the Congress did not intend the lower rate to apply to hand-blown bottles, but only to bottles made by automatic machines. It is not clear what type of machine was intended to be covered by the words "automatic machine." It appears from the record that to some of the witnesses the term "automatic machine"

includes only a machine to which the molten glass is automatically fed. In the record in the instant case (page 52) the following appears:

Presiding Judge OLIVER. Am I correct in understanding that the distinction which you make between an automatic and a hand bottle making machine is that in the hand machine, the molten mass is gathered by a skilled hand laborer, and in the automatic machine it is automatically fed into the machine? Is that the distinction?

The WITNESS. Yes, sir.

And on pages 56/7:

Presiding Judge OLIVER. Am I correct in assuming if you had a machine which was automatic throughout except for the matter of feed, what was fed by hand or by suction or flowing, that is the automatic machine you described, is that called an automatic machine?

The WITNESS. No, hand machine.

Supplement to Tariff Information on items in Tariff Bill of 1930 (H. R. 2667), referring to paragraph 218 (e), reads as follows:

Under the bill as passed by the House, all articles covered by this subparagraph, whether or not made by automatic machine, would be subject to duty at the rate of 70 per cent. As modified by the Senate, separate rates are provided for bottles made by automatic machine and for those otherwise produced. As passed by the House, the provision for bottles, vials, and jars fitted with or designed for use with ground-glass stoppers was not restricted as to the use of the bottles. As modified by the Senate, bottles with ground-glass stoppers subject to duty under this subparagraph are limited to those ordinarily employed for the holding or transportation of merchandise.

The insertion of the phraseology with respect to the method of manufacture of the stoppers or covers does not, in effect, change the classification of the articles subject to duty under paragraph 218 (e) in the bill as passed by the House.

\* \* \* \* \* \* \*

*Competitive conditions.*—At the present time four plants produce most of the domestic bottles, vials, and jars used as containers of perfume, talcum powder, and other toilet preparations. All of these plants produce such bottles by the so-called *hand-blown method*, but at least three of them produce a considerable quantity of perfume bottles by *automatic or semiautomatic machines*. [Italics ours.]

In the brief submitted to the Committee on Ways and Means by the Glass Container Association of America (Tariff Readjustment—1929, 70th Congress, 2d Session, Vol. II, page 1363), the following appears:

This association, as such, did not present a brief to your committee at the time of the open hearing on January 11 because it felt that the larger share of its business, the automatic machine-made ware, was satisfactorily protected by the present paragraph 217 of the tariff act of 1922, which covers the duties on the importation of *ordinary machine-made* glass containers. [Italics ours.]

It thus appears that the term "automatic machine" has been somewhat loosely used and in some instances, at least, as synonymous with "machine-made," as opposed to hand-blown bottles.

The Encyclopaedia Britannica, 14th Edition, Vol. 3, at page 955, under the heading "Modern Bottle-Making Machines," states:

* * *. The molten glass is supplied to the moulds of O'Neill, Lynch, W. J. Miller, Edward Miller, Hartford-Empire and Moorshead machines by automatic feeding devices. * * *. These feeding devices (fig. 8) of which the best known are the Hartford-Empire, W. J. Miller and Rankin, were invented in America.

From this it seems reasonable to infer that these automatic feeding devices, to which reference is made, were an improvement upon, and a later addition to the automatic bottle-making machine.

We have been unable to find any judicial interpretation of just what constitutes an "automatic machine," but, in *W. H. Coe Mfg. Co. et al.* v. *American Roll Gold Leaf Co. et al.*, 199 Fed. Rep. 435, the District Court of Rhode Island had under consideration an alleged infringement of a patent covering a "machine for packaging decorative films." The question of whether or not the operation of the machine was "automatic" was directly considered by the court. In this connection the court said (page 438):

The word "automatically" may properly be applied to mechanism which is hand-actuated, as well as to mechanism which is actuated by other mechanism. It may mean "self regulating," as well as self-moving. The operator may do something, and the machine may do the rest. So far as the mechanism does what the operator himself was obliged to do in the prior art, so far as machine parts act in accordance with the law of their organization, and do what otherwise the operator must do himself, so far the word "automatically" may be properly applied.

We are mindful of the fact that the manual act performed in the *Coe* case, *supra*, differs materially from that of the operator in the case at bar, but in both cases the presence and skill of an operator were required to enable the machine to "automatically" perform its task.

Paragraph 218 (e) of the Tariff Act of 1930 refers simply to bottles "produced by automatic machine" and makes no distinction between "full-automatic" and "semiautomatic."

In a publication "Modern Glass Practice" by S. R. Scholes, published by Industrial Publications, Inc., of Chicago, Ill., in 1941, the following is found on page 155 under the heading "The Gob Feeder":

One of the most important developments *in automatic glass working* has been that of the feeder. It now seems a simple matter to imagine a lump or gob of hot glass dropping at regular intervals into a forming mold. Yet this is a development that has been brought to perfection within the last twenty-five years. [Italics ours.]

Again, referring to the Encyclopaedia Britannica, 14th Edition, Vol. 2, page 785, under the heading "Automatic Machines," we find the following:

*Automatic machines*, machines which function throughout their cycle of operation without the intervention of human effort.

\*     \*     \*     \*     \*     \*     \*

The term *automatic* is rather elastic as applied to machinery and is, or should be, divided into two main classes, semi-automatic and full automatic. Nor is this distinction always definite. Full automatic machines are usually considered to be those to which the material is fed in bulk, as long bars, strips or reels of metal, or semi-finished material in quantities, as screw blanks or similar parts. [Italics ours.] \* \* \*. Semi-automatic machines require the material to be fed to or placed in the machine and removed from it, but all the mechanical operations are performed by the machine without further manual assistance.

In "Machinery's Encyclopedia" published by Industrial Press, New York, in 1917, in Vol. 1, page 178, we find the following in connection with automatic turning machines:

*Classification of automatic machines.* The term "automatic," as applied to various classes of machine tools, does not always have the same meaning, and a machine which one manufacturer classifies as automatic, would be considered semi-automatic by another manufacturer \* \* \*. \* \* \*. From the foregoing, it will be seen that the term "automatic" is a relative one as applied to machine tools generally. \* \* \*. When a machine is capable of automatically producing duplicate parts repeatedly, it is universally referred to as automatic, whereas, if it simply performs a complete cycle of machining operations, but requires the attention of an operator each time a part is finished, it may be considered automatic by some, and semi-automatic by others. *In some cases, a machine of the latter class is termed "automatic," while one that is capable of continuous operation is known as a "fully automatic."* [Italics ours.]

The Department of Labor in 1927 made an exhaustive study of the glass industry and published its findings in a booklet No. 441 in the Productivity of Labor Series under the heading "Productivity of Labor in the Glass Industry." In this report the following appears (page 36):

\* \* \*. The feeding devices are entirely independent of the machines, and may therefore be used with any standard bottle-making machine on the market.

and at page 39:

FEEDERS

Since 1917 a large number of various kinds of feeders have been introduced in the industry. The differences among the various patents are very minute and are of a technical nature only. For the purpose of this study, therefore, it will be necessary to distinguish but two kinds of feeders: (1) The multiple feeder, used for more than one machine; and (2) the single feeder, used for only one machine.

And at page 41:

As already stated, *the feeder is an entirely independent unit* and can be used with any machine in the plant. [Italics ours.]

The Department of Justice in 1938 prepared a special pamphlet for the use of the Temporary National Economic Committee on the general subject of the manufacture of bottles. The following is quoted on page 7 of this pamphlet:

Since 1917 the so-called GOB-FED PROCESS for the automatic production of glass containers has been used in competition with the Owens suction method. The gob-fed process requires a FOREHEARTH—a covered channel conducting

the molten glass from the tank to the device which feeds the charge of glass to the molds. Equipment for the process consists essentially of *two separate mechanisms: a FEEDER for introducing molten glass into the molds, and a FORMING MACHINE for shaping the bottle.* [Italics ours.]

From all the foregoing, it is quite clear that the automatic bottle-making or bottle-forming machine is one unit and the gob feeder, of whatever make, is a separate unit and can be used interchangeably with one or more of the bottle-making machines, and that when so used, the combination of machines makes what is known as a "full automatic" machine.

The machine unit which actually "produced" the bottles now before us (the bottle-forming machine) was admittedly automatic in its entire operation. The molten glass was fed by hand. The question here presented is not free from doubt and many cogent arguments could be presented in support of either side of the controversy.

However, where a literal or hypertechnical interpretation of the statute would produce a result contrary to the apparent legislative intent, then the strict letter of the statute must yield to the intent of Congress (*Procter & Gamble Manufacturing Co.* v. *United States,* 19 C. C. P. A. 415, T. D. 45578). The machine producing the bottles here before us is, in our judgment, one of the class of automatic machines contemplated by the Congress at the time of the passage of paragraph 218 (e) of the Tariff Act of 1930.

We therefore find that the atomizer bottles identified on the invoices covered by the protests herein by the following item numbers:

| | | | | | |
|---|---|---|---|---|---|
| 400 | 0965 | 0986 | 01045 | 01061 | 01067 |
| 440 | 0966 | 0998 | 01050 | 01062 | 01070 |
| 450 | 0975 | 01039 | 01058 | 01064 | 01096 |
| 460 | 0983 | 01041 | 01060 | 01066 | 01105 |
| 480 | 0984 | 01043 | | | |

and the toilet water bottles identified on the invoices covered by the protests herein by the following item numbers:

| | | | | |
|---|---|---|---|---|
| 620 | 622 | 624 | 975–E | 975–G |
| 621 | 623 | 717 | 975–F | 5091 |

were all produced by automatic machine and therefore properly dutiable as claimed at the rate of 25 per centum ad valorem under paragraph 218 (e) of the said act.

The claim in these protests is sustained to the extent indicated; in all other respects and as to all other merchandise all the claims are overruled.

Judgment will be rendered accordingly.